**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Angelica M Loreto, | No. CV-22-00269-TUC-JAS (MSA) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| v. | |
| Arizona Board of Regents, et al., | |
| Defendants. | |

Before the Court is Defendant Arizona Board of Regents' motion for summary judgment. The motion has been fully briefed and is suitable for decision without oral argument. For the following reasons, the Court will recommend that the motion be denied.

**I.     Background**[1]

Plaintiff Angelica Loreto is a former parttime employee of the University of Arizona BioCom Office. (DSOF ¶ 1.) Plaintiff's supervisor was Denise Moynihan. (DSOF ¶ 2.) In early 2016, Moynihan moved Plaintiff's workstation to the office's service desk and told Plaintiff that she needed Moynihan's permission to take lunch and restroom breaks. (PSOF ¶ 18.) Later that year, Moynihan told Plaintiff and her new coworker that they should inform each other or Moynihan before using the restroom so that the service desk was always covered. (PSOF ¶ 19.)

In 2017, Plaintiff told Moynihan that the restroom policy was burdensome and

---

[1] "DSOF" refers to Defendant's statement of facts. (Doc. 58.) "PSOF" refers to Plaintiff's controverting statement of facts. (Doc. 59-1.) The facts are recited in the light most favorable to Plaintiff. *See Taylor v. Riojas*, 592 U.S. 7, 7 n.1 (2020) (per curiam).

difficult to implement. (PSOF ¶¶ 20–21.) Moynihan responded that the service desk needed to be covered, and that Plaintiff and her coworker needed to follow Moynihan's policy. (PSOF ¶ 21.) Subsequently, Moynihan began making jokes to Plaintiff and her coworker that they needed to practice "bladder Olympics." (PSOF ¶ 21.)

In 2019, Plaintiff complained about the restroom policy to Moynihan's supervisor, Ricky Bergeron. (PSOF ¶ 22.) Bergeron told Plaintiff that he would talk to Moynihan about it, but no action was taken. (PSOF ¶ 22.) When Plaintiff complained to Bergeron again in January 2020, Bergeron told her to talk to Moynihan and that she probably needed to find a new job if she was unhappy in the office. (PSOF ¶ 23.) In November 2020, Plaintiff told Moynihan that she would be having tummy tuck surgery in February 2021, and that she would need time off for recovery. (PSOF ¶ 25.) She also told Moynihan that she would need frequent and longer restroom breaks upon her return to work. (PSOF ¶ 25.) Moynihan told Plaintiff "that's fine." (PSOF ¶ 25.)

After returning to work in March 2021, Plaintiff had recurring incontinence and lymphatic discharge. (PSOF ¶¶ 26–27.) Moynihan, however, had not changed the restroom policy. (PSOF ¶ 27.) Plaintiff no longer had a coworker in the office, and Plaintiff could not always reach Moynihan when she needed to use the restroom. (PSOF ¶¶ 26, 28.) As a result, Plaintiff had numerous incidents in which she urinated or had lymphatic discharge in her undergarment. (PSOF ¶ 28.) Plaintiff told Moynihan about these accidents and asserted that she needed more leeway to use the restroom. (PSOF ¶ 29.) Moynihan said she was "very sorry" but made no change to the policy. (PSOF ¶ 29.)

On April 21, 2021, Plaintiff sent an email to Moynihan and Bergeron stating that she was "bid[ding] farewell" and would "miss [her] BioComm colleagues," but that she "need[ed] to venture out and see what else is out there for [her]." (DSOF ¶ 2; PSOF ¶ 30.) Later that day, Plaintiff told Bergeron about the impact that the restroom policy was having on her and that she had to quit because nothing had changed. (PSOF ¶ 30.) Bergeron told Plaintiff that he was sorry to see her go. (PSOF ¶ 30.) Plaintiff's last day was April 30. (DSOF ¶ 3; PSOF ¶ 31.)

- 2 -

Plaintiff eventually filed a claim for unemployment insurance benefits, alleging that her inability to get along with Moynihan had created an intolerable work situation. (DSOF ¶¶ 4, 10; PSOF ¶ 32.) The claim was handled by the University's Human Resources (HR) Department in conjunction with the University's authorized agent and third-party administrator, Equifax Workforce Solutions. (DSOF ¶¶ 5–8.) The University objected to Plaintiff's claim and, after the claim was approved, appealed the approval to a state administrative law judge. (DSOF ¶¶ 13–16; PSOF ¶¶ 33–34.) The University says that it objected because Plaintiff's allegation of an intolerable work situation was inconsistent with the reason she provided in her resignation email, i.e., that she wanted to explore other opportunities. (DSOF ¶¶ 10–13, 16.)

**II.     Legal Standard**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when there is "evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In determining whether a genuine dispute exists, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

**III.    Discussion**

Plaintiff alleges a claim of retaliation under the Americans with Disabilities Act (ADA) and Rehabilitation Act. Retaliation claims generally are analyzed using a three-step burden-shifting framework. *See Mooney v. Fife*, 118 F.4th 1081, 1090 (9th Cir. 2024). The plaintiff must first establish a prima facie case; if the plaintiff succeeds, the burden shifts to the defendant to provide a legitimate reason for the alleged retaliatory action; and if the defendant does so, the burden shifts to the plaintiff to provide evidence that that reason is a pretext for retaliation. *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 849 (9th Cir. 2004). Defendant argues that Plaintiff's claim fails at the first and third steps. As discussed below, the Court disagrees.

### A. Plaintiff has established a prima facie case.

To establish a prima facie case of retaliation, the plaintiff must show (1) that she engaged in "protected activity," (2) that she suffered an "adverse" action, and (3) that there is "a causal link between the two." *Pardi*, 389 F.3d at 849 (citing *Brown v. City of Tucson*, 336 F.3d 1181, 1186–87 (9th Cir. 2003)) (ADA); *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 887 (9th Cir. 2004) (quoting *Brown*, 336 F.3d at 1187) (Rehabilitation Act). Defendant concedes for purposes of summary judgment that Plaintiff engaged in protected activity by requesting a reasonable accommodation following her surgery. (Def.'s Mot. 5.) The second and third elements, however, are contested.

#### 1. Adverse Action

To establish the second element, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006).[2] There is plainly a triable issue as to this element. Plaintiff offers evidence that she was eligible for and receiving unemployment benefits. (Doc. 58-1 at 48; Doc. 59-2 at 9, ¶ 23.) She also offers evidence that Defendant objected to her receipt of benefits based on incomplete and misleading information. Specifically, Moynihan knew that Plaintiff had complained about the restroom policy and that the policy had caused Plaintiff to have urination accidents. (Doc. 59-2 at 6–8, ¶¶ 9, 16–17.) Bergeron also knew that Plaintiff had complained about the policy. (*Id.* at 6, ¶¶ 10–11.) Bergeron further knew that, despite Plaintiff's resignation email, Plaintiff had decided to quit because Moynihan refused to change the policy. (*Id.* at 8, ¶ 18.)

No doubt, the HR Department would have found this information useful in deciding whether Plaintiff's work situation was "intolerable"—and thus in deciding whether to

---

[2] Although *Burlington* is a Title VII case, the Ninth Circuit Court of Appeals has held that Title VII's retaliation framework applies to ADA claims. *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1121 (9th Cir. 2000) (en banc), *vacated on other grounds*, *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002). And "[t]here is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act." *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999). Indeed, other courts have applied the *Burlington* standard to retaliation claims brought under the ADA and Rehabilitation Act. *See Israelitt v. Enter. Servs. LLC*, 78 F.4th 647, 655–56 (4th Cir. 2023) (ADA); *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1132–34 (10th Cir. 2010) (Rehabilitation Act).

1  appeal Plaintiff's receipt of benefits. Yet, the evidence indicates that neither Moynihan nor
2  Bergeron mentioned it when the HR Department inquired as to why Plaintiff resigned. (*See*
3  Doc. 58-1 at 58–68.) Finally, Plaintiff offers evidence that the appeal led to her benefits
4  being terminated and to her having to repay the benefits she received in addition to
5  Defendant's attorney fees. (Doc. 59-2 at 9, ¶¶ 21–23.)

6  Surely, a reasonable employee would find that a meritless objection that led to the
7  loss of legally authorized income and the imposition of a monetary penalty is "materially
8  adverse." Indeed, several courts have found that objecting to a claim for unemployment
9  benefits based on false information is a materially adverse employer action. *Chapman v.*
10 *Brentlinger Enters.*, 124 F.4th 382, 402–03 (6th Cir. 2024) (holding that "supplying an
11 unemployment authority with false information can be materially adverse for retaliation
12 purposes"); *Steele v. Schafer*, 535 F.3d 689, 696 (D.C. Cir. 2008) (same); *Williams v. W.D.*
13 *Sports, N.M., Inc.*, 497 F.3d 1079, 1090 (10th Cir. 2007) (same). The Court finds these
14 cases persuasive.

15 Defendant argues that summary judgment is proper because Plaintiff has not shown
16 that the objection to her claim was "frivolous/without legitimate basis under Arizona law."
17 (Def.'s Mot. 6–7.) For the reasons given above, this argument is not persuasive. To the
18 extent that Defendant suggests an employer's objection can never be retaliatory because
19 Arizona law allows an employer to object, it is well-established that improper use of
20 administrative or legal proceedings can be retaliatory. *See, e.g.*, *Bill Johnson's Rests., Inc.*
21 *v. NLRB*, 461 U.S. 731, 740 (1983) ("A lawsuit no doubt may be used by an employer as
22 a powerful instrument of coercion or retaliation."); *Steele*, 535 F.3d at 696 ("[I]n
23 *Burlington*, the Supreme Court indicated that a false report to government authorities can
24 constitute retaliation." (quoting *Burlington*, 548 U.S. at 64)).

25 Defendant further argues that Plaintiff did not adequately respond to Defendant's
26 argument, such that she waived any argument that she satisfies the adverse-action element.
27 (Def.'s Reply 2–3.) It is true that Plaintiff's brief does not include a heading and argument
28 section devoted to this issue, but it does enough to get the point across that the termination

of benefits was an adverse act. The brief's first sentence states that there is a nexus between Plaintiff's protected activity and "Defendant's decision to appeal her unemployment compensation claim . . . [*and*] *the termination of her unemployment compensation*." (Pl.'s Resp. 1 (emphasis added).) Further into the brief, Plaintiff argues that Bergeron's and Moynihan's inconsistent statements create triable issues "as to the retaliatory nature of such deceitful testimony *and the subsequent denial of* [*Plaintiff's*] *unemployment compensation claim*." (*Id.* at 5 (emphasis added).) She also asserts that "[d]enial of [her] unemployment compensation claim had a *significant* financial impact on her." (*Id.* (emphasis added).) Thus, although she could have done so more directly, she plainly argues that the denial of her claim and loss of income was materially adverse. *See Burlington*, 548 U.S. at 68 (stating that the material-adversity standard is designed to "separate *significant* from trivial harms" (emphasis added)). There is no waiver here.

**2.      Nexus**

To establish the third element, the plaintiff must show "that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). But-for causation may be established using the "cat's paw" theory. *Acosta v. Brain*, 910 F.3d 502, 514 (9th Cir. 2018). Under this theory, "even if the biased subordinate was not the principal decisionmaker, the biased subordinate's retaliatory motive will be imputed to the employer if the subordinate influenced, affected, or was involved in the adverse employment decision." *Poland v. Chertoff*, 494 F.3d 1174, 1183 (9th Cir. 2007) (citing *Bergene v. Salt River Project Agric. Improv. & Power Dist.*, 272 F.3d 1136, 1141 (9th Cir. 2001)).

Plaintiff argues persuasively that there is a triable issue as to causation under the cat's paw theory. (Pl.'s Resp. 2–4.) In her declaration, Plaintiff asserts that she requested "more leeway to use the restroom" due to incidents of urination and lymphatic discharge in her undergarment, and that Moynihan denied the request. (Doc. 59-2 at 8, ¶ 17.) She also asserts that she told Bergeron that she was quitting because Moynihan refused to change the bathroom policy. (*Id.* ¶ 18.) Moynihan's and Bergeron's depositions in this case support

Plaintiff's assertions. Moynihan testified that when Plaintiff returned to work, "she told [Moynihan] that sometimes she urgently needed to go to the restroom," and that Plaintiff "mentioned . . . at one point that she would pee in her pants." (Doc. 59-2 at 61, 69.) Bergeron testified that Plaintiff went to him after her surgery and stated that, "because of this surgery, [she] needed to go to the bathroom quite often, and that she thought that Denise wasn't letting her go to the bathroom that – when she should." (*Id.* at 44.)

As noted, although the HR Department would have found this information useful in deciding whether to appeal Plaintiff's benefits claim, neither Moynihan nor Bergeron mentioned it when Angie Simon, an HR employee, reached out to investigate. Moynihan told Simon that she "d[id not] recall anything coming up since the pandemic" and that "[n]othing c[ame] to mind" as to why Plaintiff's tenure would be "intolerable." (Doc. 58-1 at 62.) Bergeron told Simon that Moynihan "was very accommodating" to Plaintiff, that an "intolerable situation . . . just did not exist," and that he "d[id] not know of any time [Plaintiff] tried to resolve any matters." (*Id.* at 66.)

Critically, the record indicates that Simon passed these incomplete and misleading statements on to Diane Brennan, the HR Department's vice president and the final authority on whether to appeal Plaintiff's claim. (Doc. 59-2 at 75.) Moynihan and Bergeron emailed Simon on May 26, 2021, denying any knowledge of an intolerable work environment. (Doc. 58-1 at 62, 65–66.) Simon responded to Bergeron, thanking him for the information and stating that she would "be speaking to [Brennan] th[at] morning as to whether [the University would] be appealing the decision." (*Id.* at 65.) Simon sent a follow-up email that afternoon, thanking Moynihan and Bergeron for "all information provided regarding" Plaintiff. (*Id.* at 57.) Simon further stated that she had "spoke[n]" with Brennan, and that Brennan was "in agreement" to appeal the state's decision that Plaintiff "faced an 'intolerable' situation at work." (*Id.*)

These facts are compatible with the cat's paw theory. A reasonable jury could find that Moynihan exhibited animus toward Plaintiff because of her request for a reasonable accommodation, and that Bergeron was aware and did nothing to stop it. It could also find

that Plaintiff's situation was indeed intolerable, such that her voluntary resignation was with good cause and that she was eligible for unemployment benefits. And it could find that Moynihan and Bergeron made critical omissions during the University's investigation, such that the University's decision to appeal was infected by their animus. *See Poland*, 494 F.3d at 1183 (explaining that the cat's paw theory applies when the biased employee "influenced, affected, or was involved in the adverse employment decision" (citing *Bergene*, 272 F.3d at 1141)). As such, a reasonable jury could find that but for Plaintiff requesting a reasonable accommodation, the University would not have made her job intolerable and caused the loss of her legally authorized benefits.

Defendant's arguments to the contrary are not persuasive. Defendant first says that Plaintiff waived any argument as to causation. (Def.'s Reply 3–4.) However, there is no waiver; Plaintiff argued that she can establish causation using the cat's paw theory, and the Court agrees. Defendant next argues that Plaintiff failed to offer "legal argument or legal analysis explaining how a cat's paw theory" applies to this case. (Def.'s Reply 4.) That is not correct. Plaintiff discussed evidence that Moynihan and Bergeron refused to change the restroom policy and then later failed to tell Simon about that refusal. (Pl.'s Resp. 2–4.) Plaintiff then argued that Moynihan's and Bergeron's "deceitful lack of candor with Defendant's HR [Department] raises a triable issue of fact as to the bona fides of Defendant's decision to appeal [her] unemployment compensation claim." (*Id.* at 4.) Thus, Plaintiff clearly argues that the University's decision to appeal was affected by Moynihan's and Bergeron's animus.

Defendant next argues that Plaintiff "has failed to show that her former leadership (Moynihan or Bergeron) set the subject [unemployment] benefits claim process or employer response process in motion." (Def.'s Reply 4.) This argument is supported by the following language in *Poland*: "We hold that if a subordinate, in response to a plaintiff's protected activity, *sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action*, the subordinate's bias is imputed to the employer . . . ." 494 F.3d at 1182 (emphasis added). However, this language is specific to the facts of

*Poland*, where a discriminatory supervisor requested an administrative inquiry into the plaintiff for improper reasons. *Id.* at 1177–78. The important part of the cat's paw theory is that the final decision was "influenced" or "affected" by animus. *Id.* at 1183; *see Bergene*, 272 F.3d at 1141 (applying the theory where a biased coworker merely "played an influential role in the selection process"). Moreover, even under Defendant's reading, a reasonable jury could find that Moynihan and Bergeron set the appeal proceeding into motion by not being forthcoming with the HR Department. That is, there would have been no appeal if they had told Simon about Plaintiff's issues with the restroom policy.

Defendant next argues that Plaintiff "has failed to show any retaliatory animus existing on the part of her former leadership (Moynihan or Bergeron) . . . based on her having requested post-tummy tuck surgery reasonable accommodations in the few weeks before quitting." (Def.'s Reply 4–5.) On this, the Court agrees with Plaintiff: "if Loreto's protected activity was unrelated to Defendant's decision to appeal Loreto's unemployment compensation claim, Moynihan and Bergeron would not have feigned ignorance when queried by [Simon] about Loreto's claimed intolerable working conditions." (Pl.'s Resp. 4 (all caps omitted).) A reasonable jury could infer the presence of retaliatory animus relating to Plaintiff's protected activity from the fact that Moynihan and Bergeron did not tell Simon about Plaintiff's protected activity or about their response to it.

Defendant argues next that Plaintiff "has failed to show any influence by Plaintiff's former leadership (Moynihan or Bergeron) on . . . Brennan." (Def.'s Reply 5.) As discussed above, this is not correct. Defendant next argues that Plaintiff "has failed to show that the reasons underlying Moynihan's opinion [that the award of benefits should be appealed] were not the same non-retaliatory reasons as [the University's] non-retaliatory reasons for filing the . . . appeal, i.e.," that Plaintiff quit to pursue other opportunities. (*Id.*) However, under Plaintiff's theory, if Moynihan and Bergeron had told the University about Plaintiff's complaints, then the University may have decided that Plaintiff's situation was intolerable and thus decided not to appeal. Plaintiff has provided enough evidence to create a triable issue on this theory.

1    As a final note, Defendant seems to suggest that there is a disconnect between
2    Plaintiff's ground for seeking benefits (inability to get along with Moynihan, rising to the
3    level of an intolerable work situation) and Plaintiff's assertion that she quit because of the
4    restroom policy. (Def.'s Reply 2 (stating that the state's decision to initially award benefits
5    "was solely based on Plaintiff allegedly not being able to get along with her supervisor
6    rising to the level of an intolerable work situation, and not on any restroom issues or
7    requests by Plaintiff related thereto").) Defendant does not elaborate, so its overall point is
8    unclear. In any event, Plaintiff's reason for quitting is not inconsistent with her ground for
9    seeking benefits. Plaintiff could reasonably frame Moynihan's persistent refusal to provide
10   an accommodation as an inability of the two to get along. And she could reasonably
11   describe the situation, which included incidents of urination and lymphatic discharge, as
12   intolerable. Indeed, the appeal hearing before the administrative law judge included
13   questions and testimony about the alleged restroom policy, indicating that Plaintiff's claim
14   was always based to some extent on the policy. (Doc. 59-2 at 12–14.)

### B.    Plaintiff has provided sufficient evidence of pretext.

Plaintiff established a prima facie case, so the burden shifts to Defendant to offer a legitimate reason for challenging Plaintiff's claim for unemployment benefits. Defendant says that it challenged Plaintiff's claim because "per the reason given in her resignation email Plaintiff had voluntarily quit . . . simply to explore other opportunities not because of not being able to get along with her supervisor rising to the level of an intolerable work situation." (Def.'s Mot. 8.) This is sufficient to shift the burden back to Plaintiff, who now must show a triable issue as to pretext. "She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981). Circumstantial evidence of pretext must be "specific" and "substantial." *France v. Johnson*, 795 F.3d 1170, 1175 (9th Cir. 2015).

Plaintiff has created a triable issue by casting doubt on the University's proffered

reason. As noted, Defendant says that it objected based on Plaintiff's resignation email. In her declaration, Plaintiff asserts that, *after she sent the email*, she told Bergeron that she had to quit because the restroom policy was having a negative impact on her, and Moynihan refused to change it. (Doc. 59-2 at 8, ¶ 18.) So, Bergeron knew that Plaintiff's resignation email did not include the whole story about why Plaintiff was quitting, and he withheld that information from the HR Department when it was determining whether to appeal. A reasonable jury could impute Bergeron's knowledge to the HR Department and find that the University knowingly objected to Plaintiff's claim on an inaccurate basis. *See Poland*, 494 F.3d at 1183 (stating that a biased employee's "retaliatory motive will be imputed to the employer" if the employee "influenced, affected, or was involved in the adverse employment decision" (citing *Bergene*, 272 F.3d at 1141)). Plaintiff's testimony directly undermines Defendant's assertion that it believed Plaintiff's resignation email. It thus constitutes specific and substantial evidence of pretext.

As a final note, Plaintiff's response highlights inconsistencies between Moynihan's and Bergeron's testimony at the administrative hearing and at their depositions in this case. (Pl.'s Resp. 5.) Defendant says that this "challenge" to Moynihan's and Bergeron's hearing testimony is improper, because Plaintiff declined to cross-examine both witnesses at that hearing. (Def.'s Reply 6–7.) This argument is not persuasive. Plaintiff is not "challenging" the witnesses' testimony; she is pointing out their inconsistent statements. A reasonable jury could find that such inconsistencies are further evidence of pretext. *See Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 569 (9th Cir. 2004) (holding that a jury could infer pretext from an employer's inconsistent explanations for its conduct).

**IV.  Conclusion**

The Court recommends that Defendants' motion for summary judgment (Doc. 57) be **denied**.

This recommendation is not immediately appealable to the United States Court of Appeals for the Ninth Circuit. The parties have 14 days to file specific written objections with the district court. Fed. R. Civ. P. 72(b)(2). The parties have 14 days to file responses

1  to objections. *Id.* The parties may not file replies on objections absent the district court's
2  permission. A failure to file timely objections may result in the waiver of de novo review.
3  *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).
4      Dated this 21st day of October, 2025.

*/s/ Maria S. Aguilera*
Honorable Maria S. Aguilera
United States Magistrate Judge